Here he, here he, the Honorable Appellate Court of the 2nd Judicial District, is now back in session. The Honorable Closette F. Hutchinson, presiding. And please be seated. Your Honor, the final case on the count is at 22-22-0380. Your Honor, the final case on the count is at 22-22-0380. Your Honor, the final case on the count is at 22-22-0380. Your Honor, the final case on the count is at 22-22-0380. And we would not be before your honors right now. We would likely have had this case tried and would have been completed. Essentially, there is a bit of a tortured expert history in this case. We had a certifying expert who was not available to participate in the case. Then we hired Dr. Goldman, who issued cert opinions. Counsel filed a motion because we were barred from the 2011 surgery. This case came to us after the statute of limitations. So, it's not as though it was there at one point and it wasn't. Any standard of care opinions relating to the 2011 surgery were restricted. We believed and we have a duty to our client to try and preserve issues of a continuous course of treatment because she received the surgery in 2011 and the surgery in 2013. So, when we re-disclosed our opinions, we had the opinions there in total, but we had stricken certain language. Now, based on Dr. Goldman's perception that the 2011 surgery was also negligent, we, at that point, filed a motion for reconsideration on the issue of a continuous course of treatment and then proceeded to an appeal in this court. We did not provide new opinions with that stricken information removed because there is case law regarding appeals that if you file, for example, an amended complaint and you take out certain provisions, you waive that argument on appeal. So, instead, we struck the language with a line through. So, when we finally got to the point where it was time to depose Dr. Goldman, he had taken a different position, and this was in early December of your escapement at this point. Sorry, early December of what? I'm sorry? Early December of what? I believe... For ballpark, right? I think it was... Before or after the appeal? It was after the appeal. Okay, so... And there was no dispute with respect to Dr. Goldman's opinions. Okay, we were basically just going to go and have his deposition, but when he gave us the notice that by the end of January that he would not be able to participate, we tried, sent numerous emails to counsel to have his drug discovery deposition taken so we could take his evidence deposition, preserve it for trial, so that we would not have to hire another expert. We brought this issue up before the judge, the trial court, and the judge said, you're just going to have to find another expert. So that's what we did. So we found another expert, Dr. Havel, and he and we gave explicit direction to Dr. Havel that 2011 surgery is not an issue in this case. His opinions, however, and it's the same issue with Dr. Goldman, is that based on the knowledge that Dr. Bishop, defendant Dr. Bishop, acquired in the first surgery, that his actions in the second surgery would breach the standard of care. And that was the subject of a motion to reconsider on our part back when we were going to take Dr. Bishop's deposition to be able to inquire into what he knew from that first surgery. Just because we're asking what he knew in that first surgery does not mean that we were looking to make standard of care allegations against Dr. Bishop, defendant Dr. Bishop, on that point. It was because you can't just look at the 2013 surgery in a vacuum without the knowledge that he acquired because he opened the foot up and he saw what was in there and he put an implant in, and based on what he knew from the first surgery, the failure for the first surgery, he should not have done what he did in the second surgery. Well, in the second surgery, I seem to recall reading that it was the same implant that he used. Was that the extent of what you were going to ask or was there more than that? That's essentially our argument. He should have chosen a few different surgeries. He should not have placed the same implant when the first implant failed. Okay. Okay. So that's the crux of our argument. But we have to be able to go into the facts of the first surgery because we have to impute that knowledge to him because once he had that knowledge, then he shouldn't have done the second surgery. Okay. So the way he did it. Can I ask a question? Yes. You said, well, after the appeal, that Dr. Goldman was going to be unavailable and you had to get Dr. Harrell. And you also said, we wanted to preserve issues concerning, once the appeal had occurred, at that point, what was there to preserve? And so I guess my question is, I didn't want to interrupt your flow, so go right back to where you were. Ultimately, you know, I want to know is why this persistence to include in your F3 interrogatory answers criticisms, whether they're implied or explicit, when the trial court had barred it, clearly. And I can explain that address to you. Although, and I'll add one last thing. Okay. And again, you know, it's a voluminous and complex record, so you guys know it better. But Judge Schreiber and Judge Bowles, it seemed to me both said at different times, of course you will need to touch upon the facts of what occurred in 2011. So why the need to persist in these disclosures that had been barred? I guess ultimately that's going to be my issue as long as, I'll tack on one other question. What was the judge to have done? Because if the standard of review is abuse of discretion, and if it had been ordered repeatedly and brought up repeatedly, that the F3s keep containing these, you know, implications concerning the 2011 surgery, requiring the defense to come in, move to strike, trial court has to hear these things. What was she to do? What would have been a better thing for her to do than just strike it off? Let me answer your last question first. The better thing for her to do was basically just enforce the barring order if any of the language in Dr. Adle's disclosures touched upon it. Sequentially, let me, I want to make this perfectly clear. We include stricken language in Dr. Goldman's disclosures for purposes of preserving those issues for appeal. Those were criticisms of the surgery. I feel like seeing that this was indicated for purposes of review, or it's just in there, mixed in with everything that, you know, he criticizes the 2011 surgery because, as it was the wrong option for this lady's anatomy in 2011, it remained the wrong option, and maybe, you know, it's stronger for us in the 2013 surgery. It's not in, I mean, I think I've got the right document. It's not in there that, oh, we just want to preserve this. It's all mixed in there such that the defense would have to parse it out and the trial court parse it out. And I understand it could have been done, but I think their contention is, and I think the trial court would be clear, this had been done before. Okay, so I can absolutely address that. First of all, the language was stricken. There were lines through the language that was ruled upon. We filed an appeal on that language, continuous course of treatment, and we lost. Dr. Goldman's opinion did not contain that language. So we're not criticizing the 2011 surgery. Dr. Harrell's opinions does not. Dr. Harrell, the final F3. The final F3 did not criticize the 2011 surgery. Okay, they're there for reference. But the bottom line is this all could have been resolved through a 201K Congress, which is required by the rules. We were not seeking to shoehorn criticism for the 2011 surgery. We cannot talk about the 2013 surgery without the knowledge of the 2011 surgery. Now, if you just look at the disclosures, which are on page 11, what could she have done? She could have struck them. I mean, our paragraph 5 is quite clear. Dr. Harrell will likely opine that Dr. Bishop breached standard care during the 2013 surgery of Janet Olson by performing another first metatarsophalangeal joint arthroplasty. There's no ambiguity there. So if that's the, and if you look at paragraph 3, Dr. Harrell will discuss the subsequent decision of implant removal and replacement with the same. I see those. Yeah. If there's an issue with the other one, strike that. If counsel had an issue with some of the phraseology, just remember if we were deliberately trying to shoehorn this information, there were no problems with Dr. Goldman's opinion. These are experts that we hired. They file reports. We told this doctor only to look at the 2013 surgery. The rule 201K is there for a reason. It's a discovery tool. If they would have called us, if they would have reached out, we would say certainly we're not interested. And again, just because it's kind of on my mind. Okay. And I'm not, you know, trying to cross-examine you. But there was that exchange in some correspondence and e-mail in August of, is it 2020? Okay. Wait. Where it's, I think it was related to the third amended complaint is, you know, I'm going to shuffle through my papers. But I've never even looked for a judge. But in the e-mails, you proposed you had strikeouts to your F3 disclosures. I think you said, or someone from it, I think it was you, we don't want to get balled up on content. So what do you think of this? And they came back and said, well, look, with specific sub-paragraphs. And your response was not, oh, we're just trying to preserve, you know, we're not going to, it was just what's wrong with that. Or something to that effect. And if I had it in front of me, I would be more exquisite and fair. But, you know, it wasn't we're trying to preserve this review. It was, like, what's wrong with it? And there were clearly, some perhaps were not clear criticisms of the 2011 surgery. Others were more arguably criticisms of the 2011 surgery, which would require, again, require the defense to parse out, you know, what's going to come in, what will his opinions be, and the trial court to take up its time. So I guess concerning the 2011 case, I do see that previous exchange is relevant. Do you? And I'm glad you brought that correspondence up. Does that show an unwillingness on our part to work with counsel to try and come to some kind of conclusion with a discovery dispute, which is what this is? The court, it was quite clearly ruled that we cannot have standard of care opinions for the 2011 surgery. That's quite clear. And we weren't planning on that. We weren't planning on having Dr. Harrell testify to that. As a matter of fact, he was instructed specifically that that's not the issue. So in trials, if some matter is attempted to be brought up, I mean, there's a previous ruling, then sanctions are appropriate at that point. What could the judge have done? The judge could have struck any paragraph that she believes was ambiguous. I mean, the language here wasn't meant to say there's no way it says there's a breach of standard of care in the 2011 surgery. It's basically based on the 2011 surgery, he shouldn't have done what he did in 2013. So, and the fact is, even if... And hadn't that the trial court done that in, like, December of 2020? Correct. And we struck that language. And we struck it to Judge Schweiger. Right, and we struck... In his previous motion. Right, but we struck that language. And the 2020 disclosures are not an issue now. Well, you struck the language that said the first surgery. But... And then you struck language that said 2011 at some point in time. But you were still referred... Well, you said another... He should not have done... I think you just read another... Correct. Well, that implies there was a previous surgery. Correct. That apparently we weren't supposed to talk about. No, we can talk about the previous surgery. I was... Before we took defendant Dr. Bishop's deposition. And we were allowed to inquire into the first surgery. Because the knowledge he acquired in the first surgery is relevant to his choices in the second surgery. And I think that fact is being... It's escaped him. So... Well, let me... As long as we're close to that. I did want to point out. I think it was July 29th of 2020. When the trial court says, you know, no opinions of negligence and damages. Which, you know, of course, that was fine. And I don't even hear you disputing that. But she goes on. As well as criticisms, suggestions of negligence, attenuation. And or innuendo not rising to the level of the deviation from the standard of care. Of anything prior to 5, 15, 13. Okay. That's... But when she said that, I mean, how hard is it to just comply? Well, that's what we believe we did comply. With the... And there's some language that's ambiguous here. Again, these are our experts' disclosures. But there's some language that is somewhat ambiguous. Isn't that the purpose of Rule 201K? To say, look, this is... You're touching upon... I mean, you've read correspondence of our willingness to work with counsel to resolve this kind of a disease. We know there's a barring order. I mean, I just didn't start doing trials yesterday. So we know there's a barring order. There was no chance that we were going to introduce evidence of negligence. The only evidence that we were going to introduce, and we tried to frame these disclosures of Dr. Harrell in that manner. Is that, essentially, based on what he learned in his first surgery, the 2013 surgery was negligent. Period. But we cannot... You know, to the extent that any of this language touches upon innuendo, we certainly wouldn't be allowed to testify about that on trial. The resolution is not to bar an expert in his totality and basically have the case thrown out because we now cannot present an expert. That is not the appropriate solution here. I mean, I feel like we were essentially punished because we tried to protect the client's cause of action for a continuous course of treatment with Dr. Goldman's opinions that we just learned about then. Okay? And then we lost that appeal. That issue is dead. Right. We had Dr. Goldman, who we were fervently trying to get his deposition done and his evidence deposition done, and defendants would not comply with scheduling dates. We had almost two months before he started his new job at the end of January. We had almost two months where we could have taken his discovery deposition, taken his evidence deposition, and even brought that up to the court, and the court said, no. We were not looking, and there's no issue with Dr. Goldman's opinions. There's no motion there. So why would we try to come back? It doesn't make any logical sense. It's the whole point of 201K. You know, essentially, a phone call to me would have said, okay, what's the problem? Let's get rid of it. Okay. Mr. Paramides, we have to let your colleague over at the table get his time in, too. So you'll have a chance to come back. I think there's one coming. I can't remember who's coming back. One of you will come back later if you choose. All right. And Mr. Nazarian? Yes, Your Honors. Thank you, counsel. Obviously, we've gone a little over time. Will you allow me to speak on behalf of my client? Yes. Your Honors, I'm here today because, first and foremost, I was at the Court's decision. I believe that my experience in front of Judge Bowles at that moment can speak to three major issues, first being that we tried and I tried to demonstrate our willingness to try to comply with whatever the Court had problems with with our F-3 disclosures. We tried to make it very clear. I tried to make it very clear to Judge Bowles that a, as counsel stated, a simple 201K would have resolved the issue. Now, the main thrust of what I'm here to argue before you, Your Honors, is that the severity of the sanction in this case is disproportionate for what occurred. Because of our willingness, we were trying to comply. However, as Mr. Karamanis stated, we were trying to move forward with this case. It would have given us no pleasure to delay this case any further than it had to be. We came to the table, and we were hoping to get this case resolved through Dr. Goldman and then Dr. Harrell. The case law, both in precedent in Shimonovsky, we believe that that case is instructive here because the Supreme Court has instituted a mandate that 219C sanctions are inappropriate where there would be a result in dismissal, especially where there has been no blatant disregard, no contumacious disregard for the Court's orders. In this case, not only did Judge Bowles sanction our clients and deny their ability to proceed with their case, their leading to summary judgment, but also she sanctioned our clients $7,000 in costs. We believe that the summary judgment was inappropriate because we believe the sanction was so severe in this case that it is inopposite to the law. Counsel, this did not occur with your first witness. This was the third witness that had been on the scene. There is a reference to a first expert and why he or she was no longer available as an issue. We now know why Dr. Goldman wasn't. But each time you go out and look for that person, maybe through no fault of your own, it takes time. And then you have to develop the actual opinion or have the doctor do it, and then you have to edit it so that you're not doing anything inconsistent with what the Court said. And I think it appeared that the judge did not think that 201K was going to work because so much time had already gone by.  In this case, the timing of our third expert was sudden. Obviously, we had become aware that Dr. Goldman was taking a position that would prevent him from testifying because of a conflict that existed. So we attempted to get his deposition. Our time was taken to get that deposition. I believe it was sometime in January we went before the Court and we presented to the Court the set of facts that we were attempting to get Dr. Goldman's deposition, that we were attempting to get an evidence deposition, and that we were attempting to resolve it with defense counsel. The trial court then responded by telling us, it sounds like you need another expert counsel. We were given a short schedule. I believe we were only given 28 days to find a new expert and do those subsequent opinions, which we filed those in a timely fashion. We were able to get a new expert. We were able to get those opinions. That being said, after we got those opinions, we did not hear from defense counsel until we saw that motion to dismiss. Had we known, it is, I believe, replete with the record, that we were attempting to adhere to our client's best interests throughout the course of this case. We were trying to avail ourselves of the options of the Court and taking that appeal. We lost. We understand that. We understood our obligations, we understood our assignments, and we tried to craft the opinions to the best of our ability to avoid any problems. What we got in response was a motion to dismiss suddenly. We took it to the Court and said, Judge, we could have resolved this. We would do virtually anything to make sure that the opinions are sufficient so that this case could go to trial. The Court then dismissed our experts, struck the opinions, and denied my client from getting a new expert or presenting any expert, which ultimately led to summary judgment. The summary judgment in this case, we believe, was inappropriate because of the severity of the sanction. We don't believe that the effective dismissal of my client's case through the barring order was appropriate given the history. We don't believe that it was appropriate to then award a monetary sanction on top of a barring order that got rid of everything. Now, I believe Justice Mullen asked my co-counsel previously, what could have been done? What could have been done? We, as lawyers, knew our obligations. We were aware of the obligations set by this Court and by the prior judges. We tried to craft those responses, albeit, if your honors look at those responses, and say they could have been crafted differently or could have been crafted better. That is, we are here today because of that. That being said, that does not show an unwillingness of our client or us to try to alter those opinions, nor does it show and warrant both a barring order and a monetary sanction on top of a dismissal of the case. We believe that the trial court grossly abused its discretion in this case because of the fact that throughout the case we availed ourselves of the operations of the court. That did take time. We acknowledge that. It did take time, as do all of these things. Here, we have a barring order that was entered shortly after we were given leave to issue new opinions. We moved expeditiously to get a new expert in that situation. And Justice Hutchinson, I believe, touched on the fact that this does take time, and I will acknowledge that throughout the case there were delays that were caused through those experts. But what it doesn't show is some contumacious disregard for the Court's orders, something that is so egregious, something that in many of the cases that were cited by defense counsel illustrates a client or a party not appearing for depositions, deliberately, willfully not coming to depositions, refusing to tender medical records, refusing to do something in discovery that would promote compliance. Here, we have compliance that is not being sought by the court. It was not, we were not sanctioned previously, to have any specific, it wasn't as though Judge Bowles had issued some monetary sanction. I see my timing has elapsed, may I continue? It is your thought. It was not as though Judge Bowles had instituted some monetary sanction or issued some lesser sanction to plaintiffs to ensure compliance in these regards. It was a sudden, severe sanction that barred her and her husband from continuing on her case, effectively a dismissal, which we believe is inopposite to the Szymanowski decision. We also believe that the third district decision, and I believe BESCO, would be instructive in this case since it involved a very similar set of facts, though legal malpractice instead of medical malpractice. Well, speaking of, I guess it's Szymanowski, I'm not doing well with names this afternoon. There are six basic factors, and you've identified them, but did you actually apply them to this particular case in your argument? Interestingly enough, Your Honor, I think that question is better suited for the trial court. I don't believe the trial court did. I believe that in this case, you have to look at those factors, which I realize is not at my table at this point. That being said, those factors, I believe, swayed heavily towards the plaintiff. You have the surprise to defendant, which I don't believe was really a surprise here. There were issues that they brought up in the motion to dismiss. They clarified it very easily. There was no trial date set in this case. They could have very easily asked us to clarify. We were very willing to clarify any opinions that they had. So given those facts, there's no surprise and virtually no prejudice to defendants except for some additional time in drafting a motion to dismiss, which we believe would have been obvious had they just contacted us and had they moved to try to seek some sort of compliance or change. We believe that generally in this case, we were not ever essentially admonished by the court and instituted a sanction, a discovery sanction, for what we were moving forward. Opinions were stricken. We took that on appeal. It was within our rights and within my client's rights to have that appellate process. If we are being punished and being punitive because we took that appeal, I believe that is inappropriate and an abuse of discretion, especially here where the court's own ruling cited to the appellate decision, cited to the fact that it's taken a long time because of the appeal. I think your Honor should only be able to view that as a punitive decision against my client for taking an appeal from the prior court. Well, I can understand your argument in that regard, certainly. But remember, we're dealing with an abuse of discretion standard here. And it's also, I think, possible to characterize the trial court's rationale. It's taking into account the very lengthy time this case appended. And Judge, I think Judge Schreiber barred in September of 2016. And if my timeline is accurate, and again, you guys know the record better, but in July of 2020, there's a motion to strike and bar the same issue. Granted, let me just stick it all out. I want to make sure I don't. And there's certainly discussion. Let me go back to November 2 of 2017 where I think that was Judge Schreiber. He says, look, certainly there's going to be some limited questions because this is an issue of drug litigation one way or another. But just to continue, the ways in which it was an issue, there was a motion to bar sanctions after those emails in August of 2020. September 4 of 2020, that was the motion, I think. That was denied. And then we had the appeal. And, you know, there, and again, the rationale that we want to include this because we want to preserve the client's rights, but after it had been brought up this time and that time and another time, and then the appeal, and we lost all that, why come back at all? Again, leaving aside the argument, I hear your argument that this was too harsh of a response, but why? May I respond? Yes. Your Honor, I think that ultimately – I do see the final athletes do, you know, they mix in and often are at least nonspecific, and sometimes they're just plain critical of what happened in 2011. Why? Your Honor, I will be perfectly straightforward in this moment with you regarding those opinions. In those opinions, it was definitely not our intention to do that. Any type of influence or any type of criticism directly related to the 2011 surgery, if you did that, was inadvertent. We did not intend to do that. We did not mean to do that. It was not our intention.  We told him explicitly the 2011 surgery is not an issue. You may not opine on anything regarding that negligence. That was explicit. In the disclosures, if they were inartfully drafted, as you implied, I believe that that was inadvertent, but not contempt of consummation. We're switching the words, right? One of the statements in Dr. Harrell's expert report is that she had the surgery by Dr. Bishop, and then there was ongoing nerve foot and nerve pain and limitations in activity. This is the result of negligence that occurred during the course of her medical treatment. The course of her medical treatment includes 2011. I cannot speak to Dr. Harrell's statement with regard to in the course of her medical treatment. My reading of that when the report came out, and I believe my partner's reading of it was that it was in the course of her medical treatment since she was treated with Dr. Bishop beyond May of 2013 and onward. Who said that? You're correct, Dr. Harrell. And that is one of the reasons why we mentioned in our response to counsel's argument, they have not even taken Dr. Harrell's deposition. We don't have a clear indication of the meaning behind his statements. I know we have our 213 obligations, and we try to comply with those, Your Honors. But in this case, as Justice Molan had pointed out, this is an abuse of discretion standard, and we have to look at what was actually being done, whether or not this was merely inadvertent, whether or not there shows some sort of unreasonable disregard for the court's orders that is so blatant and so contrary to the laws of Illinois that it would warrant dismissal. And we do not believe that those in this case warrant such a severe sanction. We believe that there are ample avenues that the court could have taken in this. And to answer further your question, Justice Molan, I believe you spoke about it being an issue that from Justice Schneider, I believe was his name. I was not involved at that point, but I can say that at the time, the expert that we had gotten originally had indicated there was no negligence as part of the 2011 surgery. So we had proceeded on the assumption that there was no such negligence, and we did not push back in the case. We inquired about it at deposition, and counsel obviously had taken issue with some of our questions regarding that, but that was not our intent. So throughout the case, there was no intention of pushing that 2011 surgery. It wasn't until we retained Dr. Goldman, who indicated there was a possibility that this 2011 surgery was at issue, which is why at that point we felt we had an obligation to our client to address it with the appellate court, to ask the court to reconsider its position. Again, the appeal was granted. It was drawn. We then had an unforeseen conflict that arose during the pendency of the appeal, which we had to shuffle and very quickly get a new expert and new disclosures out. Given that timing, given that speed in which we developed those, found a new expert, got those new disclosures, and then presented it and tried to get a deposition out of this new expert only to be met with a motion to dismiss and a barring order, we cannot see that that is in the spirit of the laws of Illinois and the past precedent of both the Supreme Court and the other district courts surrounding it. Mr. Nasrin, hold on. I'm going to see if Justice Kennedy has any questions or Justice Mullen anything else right now. Right. One of you will come back if you choose as your counsel proceeds. Thank you very much, Alex. May it please the court, counsel. Thank you. Plaintiffs for the first time claimed that what they've included as far as the continuous course of treatment, as far as Dr. Harrell's opinion, was inadvertent. For the first time today, that's the position that they've taken. They have never once addressed anything relative to Dr. Harrell's expert report other than to say that it didn't reference 2011, that those words were not included anywhere in that expert report. And, in fact, plaintiffs actually told the trial court in their response brief that defendants had fabricated and manufactured the allegations concerning the 2011 allegations of negligence because they didn't exist in plaintiff's expert report. So now plaintiffs are telling you that there was an inadvertence by them to include or for their expert to include in his report statements concerning the continuous course of treatment, which plaintiffs never addressed during the trial court arguments or even during the appellate court briefing. The only thing plaintiffs addressed was 2011 was never mentioned or referenced. Plaintiffs have repeatedly indicated that they did nothing wrong with their disclosures. That's the point of view that plaintiffs were presenting to the trial court, leading to the trial court's decision-making in this matter. Plaintiffs never offered to revise their expert disclosures after four years of noncompliance. Well, there was some communication that Justice Mullen referred to where they did some strikeouts, and I don't know if the communication was to you directly or one of your colleagues. That looked like an effort to make some changes. So, in July of 2020, when plaintiffs had filed the expert disclosure, which completely violated the 2016 barring order, and defendants then filed a motion to strike, only then did plaintiffs file a motion to reconsider, which was completely improper because it brought up a new legal theory, which was relation-backed doctrine. And the appellate court took care of all of that. And the appellate court took care of all of that, but in the middle of all of this, before it got to the appellate court, the court had ordered plaintiffs to amend their expert disclosures to comport with her July ruling, striking and barring the expert disclosures that had all of this 2011 care and treatment, and all of the care and treatment in between the two surgeries. And plaintiffs sent over the expert disclosures, and we responded and told them, you violate the 2016 order and the 2020 order. We wrote everything out in writing as to how it was violative. You did nothing. It wasn't a strike-out that they were preserving. They had already used the strike-through to preserve those arguments that they wished to preserve. We were indicating that there's new arguments that are still in there, 213 disclosures that are not being preserved for appeal purposes by way of the strike-through analysis, but instead they are just refusing to remove it because they feel it doesn't violate the 2016 and 2020 orders. Was it ever, during the course of these conversations, was it ever proposed that either Dr. Goldman or Dr. Harrell could not limit, they could not limit in their professional capacity the problems to just 2013, and there had to be some reference to a previous treatment? I have no problem with the fact that the 2011 previous treatment was going to be discussed. I needed to discuss it, too. But it's not negligent. My client offered plaintiffs the option of a fusion, that plaintiffs, including in their amended disclosure, he offered the plaintiffs the option of a fusion, and she declined. It's in his records. I need to put that evidence in. I have no problem with 2011, the fact that a surgery was performed coming in, but that's not what plaintiffs got in these expert disclosures. And it's not just the expert disclosures by plaintiffs' counsel, which we proved, by the way, in his expert disclosure in 2022, that it is anticipated Dr. Harrell will discuss the standard of care accessible, This is their plaintiff expert disclosure, the opinion. It's not the report by Dr. Harrell. It's actually a plaintiff's attorney. Excuse me. I think I was saying expert. Plaintiff's attorney, Rule 213, S3 opinion. Which paragraph? It is the fifth paragraph down under opinions, under Section I. Is this the last? No. I know what she's looking at. I am looking at the last S3 disclosure, but I'm not looking at Dr. Harrell's expert report that he, in fact, signed. What I'm looking at is plaintiff's actual expert disclosures of Harrell's opinion. Little I. Yes. But I'm looking, it says, it is anticipated that Dr. Harrell will discuss the standard of care applicable to the care for a podiatrist performing the same or similar procedures that Janet Olson underwent. Anything objectionable about that? Same or similar procedures. He's going to discuss the standard of care for two procedures in 2011. So you see that? No. So it's the use of the plural there that you're saying? So, okay. So are there other opinions that specifically reference? No. Go ahead. If I may. Yes. If you continue through the expert disclosure, paragraph one, Pursuant to Harrell's review, the information related to the above-captioned matter, Dr. Harrell has come to the conclusion that there was indeed a departure in the care provided to Janet Olson over the course of her treatment experiences with Dr. Bishop. So did the case need to be dismissed because of that? Plaintiff refused to comply. My next question is going to be exactly how often does this come up? Because your brief certainly communicates a tale of woe with the way the case was prosecuted. But a lot of it is not really on the issue of noncompliance with the borrower. It's other stuff. So, okay. But, you know, exactly at what point through litigation did they exhibit willful and consummationist behavior in terms of the bar order? Sure. And that's a very valid point. And I guess we'd start with 922.15 because that's why the first bar order. Correct. And it's not just the bar order. Plaintiffs, in addition to the bar order, limited their complaint so that it was the allegations that existed in the 622 report that they had were completely limited to what occurred during the May 2013 surgery. That's it. They limited it on their own and it was the bar order. Which is well documented in the appeal. Yes. From there, we had issues back and forth with respect to language, including the third amended complaint that didn't comply with the court's ruling. We finally got to a fourth amended complaint. Is it an order? And I don't get this. It's not a closed book test. Yes. And it's also, I think, for our purposes, you're asking us to affirm the stringent sanction. We need to clearly delineate they violated here, they violated there, they violated this date, they violated that date. And we showed an amendment such that we should overlook your 201K obligation. Every step of the way? Back to my point, you know, what are these depths where they exhibited behavior that supports a conclusion that this final straw was willful and captivate such that dismissal was appropriate? Every step of the way was a fight with plaintiffs. Every step of the way. Here are the orders that will let us know. So in terms of what? Yes. So with respect to the third amended complaint, there were fights back and forth. It's actually addressed in the second district appellate court ruling from 2021. It is discussed in detail as to the proposed third amended complaint and how it continued into the fourth amended complaint. And that's discussed on pages 10, 11, and 12 of the appellate court ruling. Is there a paragraph in that one? Yes. It goes from 24 to paragraph 29. So first there was a debate about the amended pleading. Then from there we had Dr. Bishop's deposition was being taken or was going to be taken. And pursuant to some discovery issues that were unrelated to what you're asking me about, we ended up in front of the trial court. And as a result of the issues that were being presented and as a result of plaintiffs trying to essentially get additional discovery related to the 2011 surgery and care and treatment by providers in the office that preceded the May 15, 2013 surgery, I requested from the court that we have some type of limiting instruction with respect to Dr. Bishop's deposition because I foresaw plaintiff's counsel spending an absurd amount of time at his deposition covering 2011 and I wanted to limit it. So the court provided a limiting instruction in the November 2, 2017 order. And from there we proceeded with Dr. Bishop's deposition where plaintiffs spent over 60 pages out of 216 pages response on care and treatment from 2011 surgery. Just 2011 surgery, not even including the remainder. And in what way did that violate it? They essentially were trying to establish that this, in my opinion, sexual deformity was not corrected at any point in time with the 2011 and 2013. Then in 2013 it's still going to be a problem. And just from their point of view, they still established negligence on the part of the doctor. So it's certainly relevant to that 2013 claim, isn't it? How do you stop them in an appellate court opinion and say it bothered the defense attorney to talk about 2011 and they shouldn't have spent 60 pages at the death? The deposition itself reads full of objections between myself and Mr. Karamonis. And I can say to your honor that, again, the sexual deformity that's present during the May 15, 2013 surgery is allowed. But a sexual deformity prior to what occurred during the May 15, 2013 surgery is not permissible. Well, aren't they limited simply to saying it failed once so the same procedure is going to fail again? I don't read the orders to include that. My review of the orders is that Plaintiff 622 report, which is one of the basings for the original 2016 barring order, Plaintiff 622 report limited the negligence to solely what occurred during the May 15, 2013 surgery. And, therefore, even if there was a sexual deformity present, and Judge Volk addressed this specifically in the July 29, 2020 hearing, and there's a transcript of that in this, she addressed this specific issue. It's about the word choice. Did it fail because it was all the way in there and fail? It's about how they word things. And she addressed this with her lawyer. I'm sorry, I interrupted you here because somebody got off track. We were on the 213s at one point. I just want to make sure that we covered all of the 213s that you thought violated the order. Yes, we did not. So, expert disclosures indicate that it was over the course of the treatment experiences. Dr. Harrell's report also says the same exact thing. It says actually something worked. Talks about her damages and then says, this is the result of negligence that occurred during the course of the medical treatment. So, negligence that occurred during the course. What course? We're limited to May 15, 2013. So, these expert disclosures themselves also said, Dr. Harrell will discuss the choice of the initial, meaning the first surgery, I don't, it states initial, Austin Bunionectomy with possible implant versus a fusion of the first metatarsal phalangeal joint, which would have better addressed the first metatarsal elevation deformity and hypermobility. So, by saying that, they're indicating that his decision in the initial Austin Bunionectomy to place the implant as opposed to a fusion was inappropriate because the fusion would have better addressed her issues and corrected this underlying deformity. Again, we're going back to the initial surgery. I don't understand that. It was a prejudice view when it could have, couldn't that just have been stricken? So, every time this court entered orders, which 2016 we had a barring order, 2017 we had a barring order in July. I mean, just to be fair to the other side, before that, you know, that kind of brought to fruition, like, hey, wait a minute, there's a safety limitation here, the defense is invoking it, and that September 22, 2016 order, that's the beginning, that's the first barring order. So, maybe they had, they wanted to bring it up, they explored it, they were interested, they certainly, you know, would have prosecuted that claim if they'd have been able to, but there's nothing consummation about that. At that time, no. No, exactly. At that time. Exactly. So, 9-22-16, that's the beginning. When after that did they exhibit willful behavior? So, Dr. Bishop's deposition. We're going back to the barring order. So, Dr. Bishop's deposition was not mentioned in Judge Bowles' ruling. So, she stated in her ruling that at every case management conference, our case had to be called last, because there were always issues concerning the scope of the 2016 barring order. Every time. There was motion practice related, and in my January 2018 motion for a protective order, after Dr. Bishop's death proceeded, I specifically told the court that Plainman had not complied with the 2016 order or the 2017 order concerning limiting his deposition primarily to the 2013 surgery. She granted my motion for a protective order. That is how discovery worked during that time period. There was talk about this at every single case management conference. It's hard as an appellate court to look back and say, oh, the length of hearing means one side for sure is to blame. But what I am, and I do appreciate you pointing out that protective order, because I had forgotten about it. So, there was the protective order of, let me make sure, in 2018, I think? She granted the motion on 2018 as is. I think the protective order had been filed in January of 2018. All right. But I mean at that point. Yes. There was an instance where the trial court had said, hey, we're weary of the discussion of 2011, although her ruling and orders were always careful to say negligence and damages. Correct. Not any mention. Correct. It's not like the lady was born on the 2013 surgery. There was a history here with the doctor that both the trial court judges that I reviewed the rulings acknowledged that was going to come in. Then after it was 7-29-20, the next, where the motion to strike and bar was granted? No. The next issue that presented was when plaintiff was ordered to disclose their experts in 2019. They didn't do so until March of 2020. And when they did, they completely violated the 2016 order by their initial F3 disclosure, which included this new theory of continuous course of negligent treatment that had never been in a case. That included this. And that would have been, I don't mean to interrupt you, but that's what led to the July 29, 2020 order. In part. Yes. After plaintiff filed, again, that's where the starting point, I guess, is for plaintiff's first F3 disclosure violated the 2016 order. Then they filed that motion to reconsider, which was improper because it raised this new legal theory that hadn't been pursued previously. And then the appellate court previously took care of that, and I guess they had the right to, you know, bring this issue up, try and mitigate it, and then take the appeal if they had the right to do that. The trial court gave a 304A language. Respectfully, this was not valid advocacy. This was an attempt by plaintiff first to not comply with the 2016 order with their disclosure. And then when they brought the motion to reconsider, they claimed in the motion to reconsider that no additional discovery would be necessary so there would be no prejudice to defendants to the 13 witnesses we had deposed in the case over the course of the prior four years to just let them amend their theory of the case to now include the 2011 allegations of negligence. And they raised this theory for the first time four years after the body order in 2016, after F1 and F2 discovery was completed and 13 deaths went by. It was dangerous and an improper attempt to reinsert the allegations of the 2011 surgery and the allegations of negligence concerning that 2011 surgery back into the case. From there, the court, then, on July 29, 2020, barred, granted my motion to bar, denied plaintiff's motion to reconsider, which then she asked plaintiff to amend the disclosure, which plaintiff then sent over track changes that were redlined. And from there, the amended opinion didn't actually comport at all with either the 2016 order or the 2020 order. But it was around that time that I think two things happened again. You may well know the record, Petra and I, but in September, September 4, 2020, you, or the defense, excuse me, brought a motion to bar for sanctions, which was denied. So if we were going to examine points at which, according to you, the plaintiff should have been red flagged, that, hey, you know, you're not to be including this stuff in your F3s. That might be something that should be on the list as a red flag to the plaintiff from the trial court that you were to do this. And then I had a note as to, and you might remember better than I, December 8, 2020. Was that the hearing of the motion to reconsider? I'm not familiar with the December 8, 2020 date, because at that point, the case was on appeal. So what happened before was, in September, when the court had the motion for sanctions that I had filed, and I attached that e-mail, or there was the 201-K contract via the e-mail in August of 2020. I attached that to my September 4, 2020 motion. And also before the court on September 9 was the plaintiff's motion for a 304-A language to be included so that they could appeal the July 29, 2020 order. So she ultimately addressed this issue at the time that we were before her in June of 2022, Plaintiff's effort for disclosure did not comply in September of 2020 when she denied the motion for sanctions. She wasn't saying that they comply, but she wasn't sanctioning them because essentially their 304-A language can't be taken up on appeal. And she's saying, let's just move on with it, because we're probably going to be going to the appellate court. I'm going to interrupt. In paragraph 43 of the appellate opinion, it says, On December 8, 2020, the trial court heard argument. There was a long discussion about it. I'm sorry, paragraph 43 of the appellate court opinion. On December 8, 2020, the trial court heard argument. It looks like I could have this wrong. This should say July 28, 2020, because that's when she heard oral argument on the motion to strike and the motion to reconsider. And July 29, the following day, is when the order was entered pursuant to that July 28, 2020 hearing. So the December 8 is a typo. In the appellate court ruling. But let me get to my point, and then I'll double back without officially acknowledging that there could be a typo. I'm going to skip that. But I have a note. It says, at that hearing, whatever date it was, the trial court saying, Everybody understands that some of the prior treatment is relevant. The negligence and damages are out. So that might be, whatever that hearing date is. And you say it's when? Assuming we're talking about the same hearing, the July 28, 2020 hearing is when she heard my motion to strike and bar and granted it, and also denied, she considered it, but she denied playing this motion for reconsideration. Well, let me just make a note of that. So you say it's July 2020. July 28 was the actual hearing. July 29 was the order entered relative to the hearing. And then was there anything? October was when I believe plaintiffs filed their notice of appeal before the appellate court in 2020. All right, and then I think we could say, if we're trying to develop a list of points at which it should have become clear that the court was speaking to the plaintiff, saying we don't want this as part of your allegations of negligence, we probably could add the appellate opinion. Yes, absolutely. Which was issued October of 2021. Correct. And from there, anything else that you would point to other than? Yes. Or, you know, just alluding to the general course of what you view as hyper-aggressive litigation. I will just, Colleen, there's many more paragraphs in the expert disclosures that plaintiffs ultimately filed in February of 2022 that contain inappropriate, the final, the third set of amended expert disclosures that ultimately resulted in my motion to dismiss as a sanctioned plaintiff, which the court did not grant. But I'm looking at a trial court signaling, not them doing something. Do you follow me? I think you're saying, yes. So that's, that's. The failure to recognize the trial court's authority. I mean, that's what makes contempt. What I can say to you is that I was present at every single hearing. I have been with this case since the original filing of it in Cook County, before we transferred it to Kane. I have litigated this matter on behalf of my clients from the get-go. And what I can tell you is that at every C&C, including after the appellate court ruled, it was a discussion before the court relative to, okay, plaintiffs, that's out. We've now addressed this with the appellate court. I mean, there's no, I can't cite you a transcript of proceedings because one doesn't exist, but that is what occurred at these case management conferences. Everyone should have been on the same page. I can't fathom why after 2016, 2020, and now 2021, second district appellate court decision, how we ever received the amended disclosures that we received in February of 2022 from plaintiffs, which I detailed in my brief at Novelum. I'm happy to go over it again. But even the statement that plaintiff brings up, that plaintiff cites in plaintiff's expert report, and Novelum is clear that the expert was only criticized in the 2013 surgery, is not clear to the proposition that plaintiff argues. It's on the last page of Dr. Harrell's report, where Dr. Harrell states, Dr. Paul Bishop's medical negligence directly caused permanent injuries to Ms. Olsen during her 2013 surgery. He doesn't specify what medical negligence occurred in that sentence that plaintiff has recited to conclude this 2013 surgery. All he's saying is that the injury occurred at the time of the 2013 surgery. But in terms of the prior page, all over this prior page, it's related that this is the damage as a result of negligence that occurred during the course of medical treatment. Ms. Olsen's foot pain is permanent and related to the negligence of Dr. Bishop during her original surgery and subsequent treatment. And when your Honor asked Mr. Caranon's plaintiff's counsel what could have been done instead of dismissing the case, he said she could have enforced the order. Well, isn't that what the trial court attempted to do for years? I don't understand that argument. And to that end, I will say, plaintiffs, in their brief, still indicate that there has been no violation of any court order. That's what the position has been. No violation. They made certain comments that 2011 is not mentioned, first surgery is not mentioned. They used very almost conclusory terms that don't relate to any point in time. In some of the statements, but in others where you have, this is related to the negligence of Dr. Bishop during her original surgery. The pleading that plaintiffs have on file, and I cite this in my brief as well, plaintiffs literally define the first surgery, they put that in there, on such and such date, on November 30th, 2011, plaintiffs underwent the first surgery with Dr. Bishop in Austin, Virginia. They put in their complaint, on May 15th, 2013, plaintiffs underwent the second surgery with Dr. Bishop. That was in the first one. And then Goldman had it, sort of. That was still in the opposite complaint, that the first procedure occurred in 2011, the second procedure occurred in 2013. Again, I'm not, it was never my intention, nor was it the court's. That would sort of relate to the F3 disclosures, right? Yeah. Because ultimately, at the end of the day, at the end of the day, the F3 disclosure, not just the F3 disclosure that plaintiffs' counsel prepared, but even after they say, they told their expert 2011 is out, the expert still includes it all over the report. And there's specific statements about the continuous course of care and treatment in which negligence occurred. There's specific statements concerning, related to the negligence of Dr. Bishop during her original surgery. Mid-opening post-surgical outcome is the direct result of several factors that resulted in her failure of the implant twice. This includes, and that's where they go to say that a fusion should have been done rather than the initial bionectomy. The bottom line is, it didn't comply with the court's orders, and it couldn't even comply as far as an expert disclosure was concerned, and can't even say that the disclosure had typos or apologize to the trial court, and offer to amend to the trial court their expert disclosure. The only conclusion not to draw is that this misconduct is going to continue. Plaintiffs are not going to comply. And that's ultimately where Judge Gold found herself. She absolutely considered the factors that are announced in Szymanowski, I'm terrible at pronunciation, I apologize. She did. She had freedom. She discussed the prejudice to defendants. It was all over the brief that she read. She discussed the prejudice to defendants of having to proceed with this case where trial of this matter is going to occur probably closer to 15 years after the original surgery initial. We're already at almost 12 years from the original, excuse me, from the 2013 surgery. We are a decade into this lawsuit, and we don't have proper expert disclosure. Rather than just tossing Dr. Harrell, couldn't there, and maybe this is the point that they're trying to make, sitting down at a table and said, okay, this is what we want crossed out in Dr. Harrell's report, and if they agreed, they agreed. If they didn't agree, they didn't agree. But that never happened. Respectfully, I've had so many 201K conferences with plaintiff's counsel, and it never changed a thing. We were continuously arguing about the exact scope of the 2016 order. Plaintiffs were continuously not complying with that order, then the 2020 order, and now the appellate court's 2021 order. A 201K conference, I can't see how that would have made a difference when ultimately the arguments the plaintiff raised to the trial court in their response brief and at the hearing was that the sentence literally manufactured and fabricated allegations and mischaracterized the expert report and expert disclosure. Even so, counsel, you have the most pretentious litigation in the world where every prior attempt has failed, and you just send an email saying, if I don't hear from you by tomorrow, I will consider this my attempt to engage in a 201K conference. Isn't that enough? Then you've avoided this entire issue. Based on Hartnett versus Stack, and based on the trial court's assessment of this case, she felt that a 201K conference would be futile, and Hartnett specifically indicates that the conduct between the parties has shown that essentially a 201K conference would be futile and wouldn't serve any purpose. Then, essentially, you can still proceed with sanctions without actually having had a 201K conference between the parties. I mean, even the 201K conference that we had in 2020 didn't resolve in plaintiff's counsel sending over amended disclosures again that actually comported with what we had represented and needed to be changed. It wasn't going to change anything. Plaintiff continued in 2022 to take the position before the court that they didn't do anything wrong, that we just, defendants, were misreading and mischaracterizing plaintiff's export disclosure and export report. And I need to comment. I apologize. I know I'm probably over time here, but I need to comment on just quickly a statement that plaintiff made. Plaintiff indicated that there was no problem with Dr. Goldman's disclosure, and that isn't a correct statement of what occurred. Plaintiff, essentially, when the case came back from the appellate court to the trial court, we were in front of Judge Gold, and plaintiff contacted defense counsel and said, Dr. Goldman, his license is no longer going to be good by the end of this year. He's no longer going to be practicing. He's retiring. Can you take his discovery deposition and evidence deposition over the Christmas holidays, over New Year's, and then take his evidence deposition on a Saturday in January, less than two weeks later? We couldn't. Our schedules had been insane. We couldn't do it. There was nothing that could be done about that. Additionally, we had asked plaintiffs to provide the doctor's report, what the doctor's opinions were actually going to be. I mean, the clerk he had offered. Plaintiff did not produce that to us. So we may well, had this gone differently, we may well have been in front of the trial court on a motion relative to Dr. Goldman again before Dr. Harrell was produced. But it was really not an issue. And I only raise that because plaintiff seems to indicate that somehow, under the Shimanowski factor, defendant wasn't diligent in pursuing, you know, plaintiff's non-compliance, I guess, with the court orders. But immediately upon getting the plaintiff's amended disclosures, I, within 24 days, filed a 14-page motion. I don't think that that's untimely. And again, we were dealing with this issue. And the other thing plaintiff said that was not accurate, he claimed that the trial court only gave him, would only give him 28 days to disclose a new expert. That is not accurate. Plaintiff's counsel only asked the court for that period of time to disclose. Well, that was for disclosure. It wasn't for the actual opinion. Disclosure in 2022. The name. No, no, the actual opinions as well in 2022. The plaintiff was seeming to indicate that there was some limitation by the trial court relative to the amount of time. The court asked the plaintiff's counsel how much time he needed, and that's what he said. What year, if you can just give me a ballpark, did this problem with Dr. Goldman come up where Christmas and New Year's were going to be an issue? 2021. That 2021, but what year in the process? Oops, sorry. So. That's 10 years in? That is. The issue of surgery was 2013. The suit was filed in May of 2015. Okay. So December of 2021, you're. For six years. And. All right. We're almost at seven because we're into 2022 with the new year that they have. The point. Excuse me. The point was, I think that. This case has been out there. We've got to do something now. And you say yours schedules were busy. Was it with this case or other cases? During that time period. Out of nowhere. We had no idea that their expert was going to suddenly be unavailable and wouldn't be able to come in to testify at all. So we literally, I think they told us this in December. And we literally were trying to figure out dates that might work. But then they came in with this. Limited. Requests that we take the discovery deposition within two weeks. So. We can do Saturdays in January. That's what they were asking us. And basically. It just wasn't possible. And I'm not saying you personally, but it's Saturday. So outlandish your request. You've done other things on Saturday that relate to cases, correct? Of course. Of course. But at the end of the day, the issue is not about Dr. Goldman. The issue is about the Dr. Harold disclosure in 2022. It might not have been if we could have resolved Dr. Goldman during that period. Based on the conduct that occurred at Dr. Bishop's deposition and the witnesses from centers for foot and ankle. And the way that things had gone throughout the entire course of the case. If Dr. Goldman had testified, or even Dr. Harold, we would have had the same issues presented. Places at every turn have tried to reinsert these allegations. Or preserve these issues. I don't know what they're preserving. I don't know why they won't let this go. They have stubbornly and consciously chose to do that. And not obey the court's orders. Okay. Mr. Kennedy, any other questions? I do have one. Concerning the attorney's piece, does your affidavit, or did your affidavit break out the time spent by which attorney on what tasks? And did it need to, to comply with the applicable law? So, two questions. My affidavit did not do that. My affidavit also filed with another attorney at my firm, Steve Heil. Provided the number of hours that we had spent working on the motion for sanctions, the hearings, et cetera, that had proceeded. And the amount of money. It is within the court's discretion as to what to award as far as reasonable. I haven't gotten to that, but is it required of you to say, here's which attorney did what, on what tasks, and how long did it take them? Let me just call that an itemized bill. All the judge requested from us when she asked us to submit our petition for Kennedy was for an affidavit to be included. And we provided that affidavit. Did the law require any more? No. The law did not require anything more. The plaintiff's attorney, the case law that the plaintiff's attorney is fighting to does not involve a discovery sanction. The case law plaintiff fights to for this proposition all involves attorney fees for their client that the attorneys have not been able to get from the client. And the court in that scenario required an itemization and so forth. But in the scenario that we were presented with here, that was not the case because it was pursuant to 219, the Illinois Supreme Court Rule 219, and so consequently we provided an affidavit that expressed the exact number of hours that we had billed and the total amount that we had charged and been paid. And actually the court lowered the figure that we had submitted. So she felt that what was fair and reasonable under those circumstances was the $7,000. I also will just say the court did not dismiss this case as a sanction. She did not grant my motion to dismiss. She instead issued a barring order that dealt with the exact discovery violation that occurred over and over again. The summary judgment motion that was ultimately brought, the trial court would have had no way of knowing whether the plaintiff had any F-2 witness that could step up to provide standard of care opinions. She did not preclude that from occurring, but the plaintiff did not in fact have that F-2 witness testify in this case as to the standard of care for my client. So that's why also the summary judgment motion was phrased that it was unchallenged by anything that plaintiff added. All right. If you would please summarize and conclude your recommendation to this court. Yes. Thank you. So at the end of the day, we have multiple instances of noncompliance. We have a trial court who literally spent an enormous amount of time with counsel going over all of these things, making everything crystal clear. We have repeated noncompliance by plaintiff's counsel. And up until today, plaintiff's counsel never even addressed the fact that the expert disclosures indicated any damages occurring prior to May 15, 2013. They never addressed the fact that the expert disclosures and expert report included a continuous course of negligent treatment that had been barred by this court in addition to the trial court. They never provided any explanation for any of that until today where they said that the continuous course of treatment was inadvertent. That wasn't in the brief. It wasn't before the trial court. That was never said. So the reason that the standard of review is an abuse of discretion and that great reference is given to the trial court with respect to the trial court's rulings, and that's because the trial court is intimately familiar with what has occurred over the course of the case history. Ultimately, an abuse of discretion occurs when no reasonable person could take the view adopted by the trial court. And I would argue that there are plenty of reasonable people that could take the view of the trial court with respect to her rulings here, and I would ask your honors to affirm her rulings in this matter.  Thank you. Thank you. You're going to argue a little about it. Although I have Mr. Nasseri doing it. Yeah, we'll give him a break. We'll give him a break for the rest of the day. He did an admirable job. Your Honor, Mullen, you had asked for the timeline. In early December of 2021 is when we learned Dr. Goldman would not be able to continue to participate as an expert. Essentially, on January 27th of 2022, we informed the trial court that Dr. Goldman was no longer able to serve as the plaintiff's expert. And then we disclosed Dr. Harrell's opinion on February 28th, 2022. Counsel, on that point, Dr. Harrell, in his report, so in the 213s, and, you know, counsel for the defense has pointed out, some language. We can maybe quibble over the use of the plural with regard to procedures, treatment experiences, another arthroplasty, subsequent decision. Those may or may not be violative. But how does the paragraph number two not directly violate the court's order in saying Dr. Harrell will discuss the choice of the initial Austin-Hunion with possible implant versus fusion of the first metatarsal joint, which would have better addressed the first elevation deformity and hypermobility. Combined with the statement in the expert's report from February 28th, 22, that it is my opinion within a reasonable degree of medical certainty that Ms. Olson's foot pain is permanent and related to the negligence of Dr. Bishop during her original surgery and subsequent treatment. How are those two statements not directly in violation of the court's orders? Dr. Harrell prepared a report. His report is not our disclosure. All right. So let's set that aside. In the 213s, you listed the choice of the initial. Correct. That's a factual analysis that Dr. Harrell was going to address, the choice, why he chose that particular item. We did not say there that that choice was a negligent choice. Only that he was going to discuss that choice. Now remember, counsel just minutes ago said she was going to go into the first surgery about that choice with the plaintiff and why she did not choose a fusion. So that's a fact of the first surgery. So nonetheless, she discussed the choice of the first surgery. Correct. That is a factual why that was chosen. And counsel herself said she was going to talk about that same choice as opposed to the fusion. And that's what could have easily been clarified in the 201K conference. Well, she did say that at least what she offered here was that Mrs. Colton said, no, I don't want that to happen. She said she didn't want the fusion. Right. So that's a fact. That's over. It's not negligent. She can't be negligent because she doesn't, you know, she's not capable of that. Correct. She wants to do it that way. She wants to do it that way. So that does not involve negligence at that point. It doesn't even involve a conversation about negligence. Correct. And that's not what paragraph 2 addresses. It doesn't address it. Paragraph 2 does not address a negligent choice. It's just going to discuss the choice. But it ultimately is followed, and I don't have the page open anymore, by this course of conduct or course, continuing course of negligence. So it's got to start somewhere. Perhaps it was a, you know, an inappropriate term to use, but the course, meaning the course during the second surgery. It doesn't mean the course during both surgeries. We were barred from that. It could have said this shows a conduct, a negligent conduct in engaging in the 2013 surgery, or in completing the 2013 surgery. But it doesn't say that. It says that in paragraph 5. Okay. But then get rid of paragraph 2. You could have done that. You didn't. We didn't because there was no 201K conference to discuss that issue. It was just a motion to bar, and we referred the judge, and Mr. Nazarian indicated, and he told the judge there was no 201K conference, so we could have resolved these issues. That's the whole point of 201K is to resolve issues like this. This is not, I'm not trying to backdoor or blame. You're talking to counsel, and you talk to the judge. At least I'm assuming counsel was listening while you were talking to the judge, and you were listening while counsel was talking to the judge. So you knew what the issue was. At that point, there was a motion to bar. Okay. So could we have done things better? Could we have said, can we judge, can we, like, revise these to make sure there's no ambiguity? Perhaps that was a better course of action. That still does not justify throwing the whole case out because of the ambiguous language. Can I just? Yes. At what point was there a motion to bar? Like this, as I understand it, these are your final F3s. Correct. Which I've lost track of exactly when. That was February 28th of 2020. Yes. Thank you. There was a motion to bar previous to that, but that had been denied, what, September 4th, 2020? And then there was the appellate opinion. Correct. There has been a motion to bar, but I didn't see it at the time when you released that. No, no. There was no motion pending. And counsel kept referring to our disclosures as amended disclosures. These are new disclosures from a new expert. These aren't amended from the previous expert. So, essentially, there is ambiguous language here, and, you know, I think what Mr. Nazarian conceded is not a new disclosure that we're saying was a continuous course. He's saying that we agree that some of the language was perhaps ambiguous. But that's, again, the whole purpose of 201K. And I'd like to counsel-side it to the Hartman case. But in that case, the defendant simply did not respond to interrogatories and requests for document production. They showed an unwillingness to cooperate in scheduling the defendant's reposition. You know, that's not the case here. You know, we didn't like some of the rulings of the court, obviously, because we tried to preserve an issue for appeal and brought up an appeal. And, you know, obviously, we accept it. But to say that for counsel to stand here and to say that I wasn't zealously representing my client but deliberately not complying is just false. It's just absolutely false. I mean, we prosecute a case. We represent our clients. We do the best that we can for our clients. And that's what we were doing. And we're not-and these disclosures, you can see, we filed a substitute expert. The case has been going on for a while. We filed a substitute expert in a relatively short amount of time and worked vigorously to get his disclosures in. We included-we did not include everything in his report because of the barring order. But this position, Dr. Harrell didn't know it. So there's a couple other points I'd like to bring out from counsel's argument, which I think are also just incorrect. To say that at every CMC conference there was a dispute about discovery is just patently false. I mean, it's just not true. And when counsel indicated my response to what the judge could have done differently, it wasn't-I didn't-when I said she couldn't enforce the order, we weren't necessarily saying to enforce the order with respect to Dr. Harrell's opinion. So the order was in place. Those opinions were barred. So if we had attempted, what I meant, what I think I said, is that if we were at trial and any type of evidence was sought to be introduced with respect to the 2011 surgery, she would enforce the order, saying this has been previously barred, you know, objection sustained, right, which we would have tried to do. So that's why I said enforce the order. That's what I'm talking about. But this could easily have been resolved. Well, but short of the judge taking her red pen, and I'm assuming she has one somewhere, and crossing out things and saying, okay, this is what you got, we're going with this, it's not her job to do that. Right. And I don't necessarily disagree, but if you look at our disclosures, again, the bulk of these disclosures relate to the 2013. And any reference to 2011 was meant as a factual inquiry, because as counsel indicated herself, she was going to go into the facts of the 2011 case. So to say that is that I was somehow in Dr. Bishop's deposition being confirmationist, because I was asking about the 2011 surgery. I had a conversation with counsel prior to that deposition. If she did not go into the 2011 surgery, I wouldn't either. She said, no, I'm going to go into her choice. So I have a duty, if she's going to use that as a defense that the plaintiff chose not to do a fusion, then I have a duty to go into the facts surrounding Dr. Bishop's decisions and the circumstances. Well, there were two options. Maybe one was better than the other. Okay, let's just, from my listening and reading here for this case, two options. One might have been better, but she chose the one that ultimately maybe wasn't better. But she can't commit negligence. The doctor says, okay, I'll make it work. That's not, you know, that's not discussing negligence. That's discussing what happened. Exactly. Now you then put it in terms of continuing course of negligence during her treatment. Now with Dr. Bishop isn't in there, but that's implied. But not in these disclosures of Dr. Harrell. We don't put, we're not saying his continuous course of treatment was negligent. We're saying in the course of the treatment, I think in the first paragraph it says, over the course of her treatment experience with Dr. Paul Bishop, that perhaps is a little amused, but that relates to the 2013 surgery. It doesn't say that, but we will never be limited to the 2013 surgery. So do we have to explicitly say this paragraph relates only to the 2013 surgery? So for every paragraph, do we have to put that out? Because we already had a Barton order, so we were just providing the opinion. And you can see the differences between his report and our disclosures. We did call out that reference to continuous course of treatment. So, and I think, again, this could easily have been resolved in 201K. If you look at all the cases with respect to whether a 201K conference would have been fruitful, we had 201K conferences. Sure, we had disagreements, but we had 201K conferences. I made some concessions, counsel made some concessions, and we were able to move on. We didn't necessarily agree on everything, but that's the whole point of the 201K. So. Can I ask you this? Yes. You know, you said, well, we could have just, we would have had more time to limit it, and we would have solved it at trial, and I guess my question is, doesn't the whole 213 framework require you to disclose, down to specifics, the underpinnings of the experts' opinions, I should say, such that a deposition might not be required? I mean, you know, you've also said, well, a deposition could have gone into it, but 213 doesn't require everybody to take a step. In fact, it's my opinion that the. Disclosures were insufficient, and I would again point. No, that's why I added. Well. One, 213, but two, the bar order. Right, the bar order. So that was part of the framework here. That's part of what you were stuck with, with your 213 disclosures. Correct. Well, I think, like, in paragraph five, for example, we specifically say breach the standard of care during the 2213 surgery. That's specific to that, to the surgery. And we also say that in. With respect to the subsequent decision of implant removal and replacement. That's a subsequent decision. That's obviously related to the 2013 surgery. So, could there have been more detail and specific? I'm not disputing, especially because we're here. Obviously, there could have been more detail and specific. But in the context of the court's bar order, you know, the disclosures obviously, in our view, relate to the 2013 surgery. So, it's, I mean, it's the other side of the coin. So, these disclosures were made with the concept that there was a bar order in place for the 2011 surgery. So, in our view, obviously, none of these are meant to go to the 2011 surgery. Why would we do that? There was no problem with Dr. Goldman's deposition. And, Your Honor, with respect to the questions regarding Dr. Goldman's deposition, I remember this, I was feverishly trying to get this scheduled. And while there were counsel related, there may have been vacations over the holidays, there was no vacations in January. And we tried to get this set up in January. And the evidence deposition would have been taken by us because he's our witness. Okay, so the discovery deposition would have been taken by them. And they proposed several, several different dates to try and get this resolved. There was nothing in between those two dates that, after the appellate court decision, that the disclosures, Dr. Goldman... Counsel, you would summarize and conclude. Okay, so, essentially, there were not multiple issues of noncompliance. There were issues of us representing our clients to the best of our ability. Defendants essentially contort the facts of this case to support a narrative that simply does not exist in reality. If you look at all the cases cited with respect to these types of sanctions, they're like not producing documents. They're like not showing up for depositions. They're not, you know, the parties disappear. We were involved in this case from the beginning. And, essentially, it was a surprising order nonetheless. So, essentially, you know, based on... I'm sure you've heard enough, but based on everything that you've read, we believe that the lower court's decision should be overturned and the sanction order vacated. And that, you know, we'd like to go and proceed to trial. So, essentially, that's where we're at. Thank you for your time and patience. Thank you both today for waiting for us, and thank you for your arguments. We will take the matter into advisement. We are now going to stand, I believe, adjourned for the day, unless we have administrative matters to deal with.